# FILED UNDER SEAL
## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES EX REL | § | |
| SANTIAGO MENDOZA, JR. | § | |
| *Relator* | § | |
| | § | |
| BRINGING THIS ACTION ON | § | **CASE NO:** |
| | § | |
| BEHALF | § | |
| | § | _____ |
| *of* | § | |
| | § | |
| THE UNITED STATES OF AMERICA | § | |
| | § | |
| Honorable Eric Holder | § | **FALSE CLAIMS ACT** |
| Attorney General Of The United States | § | **QUI TAM** |
| Department Of Justice | § | |
| | § | |
| *and* | § | |
| | § | |
| Honorable **Kenneth Magidson** | § | *FILED IN CAMERA &* |
| United States Attorney, | § | *SEALED PURSUANT* |
| Southern District Of Texas | § | TO |
| | § | 31 U.S.C. § 3730(B)(2) |
| *v.* | § | |
| | § | |
| HCA Holdings, Inc./Hospital Corporation | § | |
| of America a/k/a HCA, CLRMC, Inc., an | § | |
| affiliate of HCA, Inc., and Stephen K. | § | |
| Jones, Jr., CEO of CLRMC, Inc. | § | |
| *Defendants* | § | |

<u>RELATOR'S ORIGINAL COMPLAINT</u>

COMES NOW, Santiago Mendoza, Jr. ("Relator") in the above styled and numbered cause of action, by and through his attorneys of record, Michael J. Stanley and STANLEY FRANK AND ROSE, LLP, stating that this is a Qui Tam action brought on behalf of the United States of America by the Relator pursuant to the Civil False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA") for violations of  the Anti-Kickback statute, 42 U.S.C. §1320a-7b(b) ("AKS") and the Stark statute, 42 U.S.C. 1395nn ("STARK"), and would show as follows:

<u>Overview of the Kickback Scheme</u>

Defendants are engaged in an illegal and very clever system of kickbacks where patients are used to reward loyal physicians and punish others who do not blindly send their patients to Defendants' hospital.  The essence of the plan involves steering valuable patients to physicians who agree to perform procedures on those patients exclusively at Defendants' hospital.  These unwitting patients do not know that they are being used as currency to incentivize physicians and, most importantly, they have no idea that their healthcare decisions are being influenced by a series of elaborate payments.  Defendants have run this kickback scheme before and the plan has been extremely lucrative – hundreds of millions of dollars in Medicare reimbursements have been paid to those involved in the last three years alone.  Relator brings this action in order to stop these illegal payments and

recover taxpayer funds paid to Defendants in violation of the FCA, AKS and STARK laws.

PARTIES

1.      Relator Santiago Mendoza, Jr., is the *qui tam* Relator in this case ("Relator"). He is a citizen of the United States, and a resident of the State of Texas. Relator brings this action under the FALSE CLAIMS ACT, 31 U.S.C. §3729, *et seq.*, on behalf of the United States of America.  This action is based upon direct and independent information obtained during the Relator's employment as the Director of Business Development at CLRMC from 2008 through 2012.

2.      Defendant HCA Holdings, Inc. a/k/a Hospital Corporation of America, is a foreign corporation, organized and existing under the laws of the State of Delaware ("HCA").  HCA's home-office address is One Park Plaza, Nashville, TN 37203.  HCA's registered agent is Corporation Trust Company located in the Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware, 19801.  HCA may be served with process by serving the Texas Secretary of State, 1019 Brazos Street, Austin, TX  78701, as its agent for service because Defendant engages in business in Texas but has not designated or maintained a resident agent for service of process in Texas.

3.      Defendant Clear Lake Regional Medical Center, Inc. is one of approximately 165 hospitals and approximately 115 freestanding surgery centers

owned and operated by HCA ("CLRMC").  CLRMC is part of the HCA Gulf Coast Division.  CLRMC's principal place of business is 500 W. Medical Center Blvd., Webster, TX 77598.  CLRMC may be served through its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX  75201-3136.

4.      Defendant Stephen K. Jones, Jr., is the CEO of CLRMC ("Jones"). Jones resides at 7610 Ashton Dr., Houston, Texas 77095. Jones is responsible for CLRMC, The Heart & Vascular Hospital, Bay Area Surgery Center, The Breast Diagnostic Center, The Wound Treatment Center, Calder Urgent Care, and two free-standing Emergency Centers.

5.      As used herein "Defendants" refers to HCA, CLRMC and Jones, collectively.

<u>JURISDICTION AND VENUE</u>

6.      This Court has subject matter jurisdiction with respect to this action pursuant to 28 U.S.C. 1331 which provides District Courts with subject matter jurisdiction over all civil actions arising under federal laws, the Constitution, or treaties of the United States.  This complaint alleges violations of the Anti-Kickback statute 42 U.S.C. §1320a-7b(b), the Stark statute, 42 U.S.C. §1395nn, and  the False Claims Act, 31 U.S. C. §3729 *et seq*.  An action under the FCA may be brought in any judicial district in which the defendant, or in the case of multiple

defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by the FCA occurred. The Defendants conduct substantial, regular, continuous and systematic business in the State of Texas, namely providing healthcare services to thousands of patients in the south-central Texas area, and therefore have submitted themselves to the jurisdiction of this Court. Venue is proper under 37 U.S.C. 3732(a) in that all of the events, acts and omissions giving rise to this lawsuit occurred in Harris County, in the Southern District of Texas.

## SUMMARY OF THE ALLEGATIONS

7.     Relator was employed by HCA Affiliates, including CLRMC, from 2003 until 2012. While employed as Director of Business Development at CLRMC Relator witnessed the CEO, Stephen K. Jones, Jr., develop a clever scheme of lucrative incentives, rewards and punishments designed to illegally enhance Defendants' revenue and defraud the government. A key component of the Defendants' "Reward Plan" involved taking control of the patient referral process to ensure that certain physicians would treat patients only at CLRMC.

8.     The scheme, believed to be ongoing, uses referrals from Defendants' clinics and emergency rooms, i.e., patients, as remuneration to reward and incentivize physicians. Under Defendants' Reward Plan, staff at their clinics and emergency rooms ("ERs") are instructed to send all the referrals to the small, select

group of loyal physicians hand-picked by Jones ("Loyal Physicians"). These physicians are given remuneration in the form of valuable patients to reward and ensure their loyalty. Other physicians who send patients elsewhere are punished because Defendants' prohibit referrals to them. Patients are never told they are the remuneration Defendants pay to Loyal Physicians, or that the Loyal Physicians have agreed to treat them only at Defendants' hospital. Patients are unaware that at least two major decisions – choice of a physician and choice of a hospital – have been corrupted.

9. Defendants intentionally bill the government for Medicare cases that the Loyal Physicians bring to CLRMC. In connection with the Medicare claims submitted to the government, Defendants certify to the Government that they are in compliance with all relevant laws. These certifications are false claims and the government would not pay these claims if the true nature of the referral relationship between CLRMC and the physicians was known. On information and belief, the payments received from the Government as a result of these false claims have not been refunded to it in a timely manner as required by law. Defendants' scheme has resulted in increased profit to both the Loyal Physicians and CLRMC.

## RELEVANT FACTS

10.    Most patients believe that healthcare recommendations given to them by their physicians are based upon what is best for the patient.  Congress, on the other hand, has been acutely aware of the dangers that arise when medical decisions are influenced by undisclosed financial rewards.  As a result, the federal government has enacted numerous laws to protect patients from the corrupting influence of money in their healthcare decisions.  This case exposes the type of rewards the law was intended to prevent, and Defendants' knowing violation of those laws, placing profit above patients.

## RELATOR BEGINS WORKING FOR DEFENDANT JONES

11.    Defendants' scheme was made known only through the efforts of Relator Mendoza.  In 2007, Relator Mendoza began working for HCA Affiliate Rio Grande Regional Hospital ("RGRH") in McAllen, Texas as the Director of Physician Relations.  RGRH is a "For Profit" hospital, as are other HCA affiliates, including Defendant CLRMC.  Relator's job at RGRH required him to visit the practitioners in the community and act as a liaison between the hospital, the physicians and the community.

12.    Relator was an integral part of RGRH's efforts to convince quality physicians to select RGRH's facilities for their hospital needs.  The cases brought

by doctors, in short, generate revenue for the hospital.  Revenue leads to profits.
And, like other publicly traded corporations, HCA is under constant pressure to
generate profits for its shareholders.   Relator was able to grow relationships which
led to increased patients. It was while employed at RGRH, that the Relator met
Steven K. Jones, Jr.

13.    In 2008, HCA offered Jones a position as CEO of the CLRMC in
Webster, Texas.  Jones asked Relator to relocate and work for him as Director of
Business Development at CLRMC.    Relator accepted Jones' offer and moved to
Webster.  At CLRMC, Relator was critical in creating, promoting and maintaining
good relationships between the hospital, practitioners and the community.  As part
of his job responsibilities, Relator visited the physicians in the area and relayed the
physicians' ideas and concerns back to the hospital.  By acting as a liaison between
the doctors and the hospital, Relator resolved problems and ensured that physicians
and the hospital were on good terms.  He also educated physicians on the service
lines, equipment and facilities at CLRMC.

14.    Aside from customer relationship management, Relator represented
the hospital in the community.  Jones also asked Relator to help him execute the
Defendants' strategic business plan.  In so doing, Jones directed Relator in ways
that were of concern to the Relator, as described below.

## JONES ANALYZES THE PHYSICIANS PROFITABILITY

15.    Soon after Jones assumed the helm at CLRMC, he began analyzing and sorting statistical information all of the physicians affiliated with CLRMC (the "Physician Data"). Jones analyzed the profitability of physicians in every practice area using various metrics, including EBITDA information available to him on each physician.[1]

16.    Jones obtained the Physician Data from CLRMC's Chief Financial Officer, its accounting department, and from the HCA Gulf Coast Division in Houston.  Jones also asked Relator to analyze the Physician Data and provide him with breakdowns in the form of tables, spreadsheets charts, graphs and presentations.   Jones then had the Physician Data sorted by specialty or practice area.  By doing so, he identified the most profitable physicians in each practice area or specialty.

## JONES SEPARATES "LOYALS" FROM "SPLITTERS"

17.    After the physicians were grouped by practice area and ranked by profitability, Jones went through the Physician Data and identified which physicians did most of their patient cases at CLRMC.   Jones referred to these

---

[1] "EBITDA", or Earnings Before Interest, Taxes, Depreciation and Amortization, is one indicator of financial performance.  In its most basic form, EBITDA is net income with interest, taxes, depreciation, and amortization added back in.  It can be used to analyze and compare profitability between companies and industries, or in this case, physicians.

physicians as "Loyal Physicians."   The Loyal Physicians were not hospital employees but, instead, physicians in the community with private practices outside the hospital.   As such, they and their patients had healthcare choices as to where their procedures cases were performed.

18.   Jones also identified those physicians that treated patients at multiple hospitals.   Jones referred to these physicians as "Splitters."   Jones' intent was to give rewards to Loyal Physicians so that they would remain loyal, and punish the Splitters for treating patients elsewhere.   Under Jones' plan, Splitter physicians would not be invited to participate in the Reward Plan no matter how profitable they were.

<u>DEFENDANTS' REWARD PLAN</u>

19.   When patients typically arrive in an ER without a treating physician, they are considered "unassigned."   Before Defendants implemented the Reward Plan, unassigned patients were referred to any qualified physician who saw patients at CLRMC.   The referrals were made by emergency room staff as the staff determined appropriate and were an important source of income for the physicians.

20.   The Defendants' Reward Plan took control of the referrals away from the ER staff and used the promise of new patients as a reward for loyalty.   Jones used this flow of unassigned referrals as a reward system for doctors.   Jones

carefully reviewed the Physician Data and personally decided which physicians would be eligible for the Rewards.  Loyalty was the benchmark.

21.     Jones went through each practice area and compiled a list of the Loyal Physicians to whom he would direct the flow of the patients (the "Referral List"). The Splitters would get nothing.  Relator spoke with Jones about his concerns that this was an illegal kickback.  Jones replied:  "Don't worry, it's OK – I have done it before."

22.     Jones then held a series of dinner meetings with the doctors on the Referral List.  The meetings were held with each practice group, one per night, over several days.[2]  Jones said that he would call each group a "Center of Excellence," although "Center of Profit" would have been a more appropriate name.  As it turned out, inclusion in a "Center of Excellence" actually required little more than an agreement not to practice at other hospitals in return for new patients and other perks.[3]

23.     Many of the physicians on the Referral List were also offered directorships, board positions and other perks such as lavish build-outs to their

_____

[2] The practice areas identified on the Referral List included: Cardiology, Oncology, Family Practice, Pediatrics, Pediatric Subspecialists, Gastrointestinal, and Women's.

[3] In 2011, Jones met with two cardiologists who were upset at being cut out of the Defendants' Referral Plan because of the loss of income they previously derived from the referral process.  They told Jones they wanted to join the Cardiology Center of Excellence. When Jones explained that they must agree to use only Clear Lake Regional Medical Center, the physicians declined to become involved. Jones said that he did not need their business anyway and continued to withhold emergency room referrals from them.

office space.  Directorship positions and fees were excessive and not in proportion to the hospital's need or fair market value for any services rendered.  In other words, the directorships were just an excuse to pay Loyal Physicians in exchange for their agreement to perform cases at CLRMC.  In fact, many directors did little more than attend Physician Advisory Dinners where financial goals and profits were the main topic.  The Loyal Physicians' income and patient volumes rose as a result of Jones' Reward Plan, as did the profits received by CLRMC from the cases Loyals brought to the hospital.

PATIENTS ARE REDIRECTED BY DEFENDANTS
FROM OTHER MEDICAL FACILITIES

24.   Defendants directly, or through affiliated companies, owned additional healthcare facilities that generated patient referrals for physicians.  Upon information and belief, these facilities also received Medicare payments and included the HealthOne Emergency Centers in Alvin and Pearland, and Calder Urgent Care Clinic in League City, Texas (collectively, "Other Facilities").

25.   Just as he did with CLRMC's emergency room, Jones required these Other Facilities to send patients to only those doctors on the Referral List.  The office manager and physicians at the Other Facilities were required to keep a list of where they sent patients.  Jones reviewed these lists regularly and compared them

to his Referral List to confirm that patients were not being sent to Splitters or others who were not established as Loyal.

26.    These referrals were so valuable to Defendants that Jones required staff to track and account for them.  When patients were identified who were sent to Splitters, the staff was required to discuss those referrals later with Jones.  At least one of the Other Facilities, Calder Urgent Care, had a physician express unwillingness to send patients to a fixed list of doctors chosen by Jones.  Jones repeatedly dispatched Relator to meet with the physician and enforce the Referral List.  In addition, at least once a month, the office manager of Calder Urgent Care was required to appear at CLRMC in front of Jones, CLRMC's CFO, Relator and other senior staff.  At this meeting, she was required to go over the list of patients seen by the urgent care facility.  Jones questioned her as to why physicians were getting referrals if they were not on his list.

27.    After the office manager was excused, Jones would tell Relator to pay a visit to the urgent care facility and tell them that "Stephen Jones is not happy." Jones told Relator to "push the Referral List" until, eventually, the doctors on the Referral List were receiving their loyalty rewards (additional patients from Calder Urgent Care). Similarly, Defendants ordered Relator to make visits to the Other Facilities and push the Referral List.

ABOVE MARKET BUILD-OUT PERFORMED TO KEEP PHYSICIAN

28.     Relator also has first-hand knowledge of at least one build-out at a medical clinic where expensive upgrades were performed on the space in order to induce an OBGYN physician to continue sending patients to CLRMC.  In one of his regular meetings with a physician, Relator learned that a practice group was breaking up and the physician was thinking of leaving the area in order to find affordable clinic space.  Relator was aware of a space that was move-in ready and had formerly been used by a gynecologist. With a little paint, the space could be used by this OBGYN.  Relator suggested the space, and a meeting was held with Jones and the physician. At the meeting, the physician explained that he wanted more rooms and said that he wanted to use a relative to design the build out. In short, the request was for much more than paint and minor improvements.

29.     Jones and the physician next met with the property manager and got a quote on the changes to the space that the physician was requesting. The quote came back very high.  Jones and the property manager then spoke with the HCA Nashville office regarding the desired upgrades.   The Nashville HCA representative came to Texas and viewed the space.  A decision was made to disregard the initial quote, obtain another one and to say that the space was not move in ready.  This would justify CLRMC assuming the cost of the extensive upgrades in order to meet the doctor's desires.  When the Relator learned of this he

questioned the decision and expressed concerns.  Not long after this the Relator resigned knowing he would be unable to influence the Defendants' decisions regarding physician incentives.   Several months later Relator visited the doctor's new office and saw the luxurious build-out that HCA provided. He also learned that CLRMC paid the doctor's relative for the interior design work.

<u>UNNECESSARY PROCEDURES PERFORMED</u>

30.    In addition to the above described system of finding and incentivizing loyal, high volume physicians by inviting them to become part of Centers of Excellence, inducing them to remain loyal with incentives such as directorships and build-outs, Relator witnessed other violations of federal law.  For example, Relator was approached in confidence by employees and at least one physician who said they were told to perform or order unnecessary treatments and procedures for patients. The physician who confided in Relator ultimately resigned after refusing to be pressured into increasing procedures by prescribing unnecessary treatments.

<u>STEPS IN CREDENTIALING PROCESS SKIPPED</u>

31.    A cath lab employee confided to the Relator that he had been instructed to repeat or perform unnecessary echocardiograms. In addition, in order to obtain accreditation through the IAC (Intersocietal Accreditation Commission), this employee was instructed to complete forms required to be completed by a

cardiologist (echocardiogram interpretations) in order to have all paperwork completed for this accreditation. This included the employee being given two physicians' passwords so that echocardiogram interpretations could be completed. If those physicians had not completed the interpretations, or had the interpretations completed by the employee, it would not have been possible for CLRMC to obtain this accreditation.

32.     As the facts above indicate, the Defendants intentionally, knowingly and willfully cause false and materially fraudulent claims for payment to be submitted to the government for services provided to individual Medicare beneficiaries. Defendants also submit claims for general and administrative costs incurred in treating those Medicare beneficiaries. Many of the beneficiaries' claims were obtained as a direct result of Defendants' unlawful physician referrals, kickbacks and improper financial arrangements. Defendants' scheme is a fraud upon the government by which they intentionally induce the government to pay claims that it would not otherwise pay, in order to obtain or keep federal money.[4]

<u>DAMAGES</u>

33.     CLRMC intentionally bilks the government out of millions of dollars. Patients are completely unaware that they are being sent to physicians as a result of a financial arrangement between CLRMC and physicians. Patients are also not

---

[4] This is a direct violation of the False Claims Act, 31 U.S.C. § 3129 et seq.

aware that often the tests, treatments and procedures they undergo are influenced by money to be made from their illnesses and healthcare concerns.

34.    On information and belief, CLRMC currently generates revenue in excess of $2.6 billion per year.[5]  Millions of those dollars are received as a result of the Defendants' fraud on the government.  Since 2011, CLRMC has risen from No. 20 on Becker's list of 50 Top-Grossing For-Profit Hospitals with $1.5 billion in gross revenue, to No. 12, with over $2.6 billion in gross revenue.[6]  In 2011, the Cardiology group comprised 8% of the contribution margin and yielded the highest profit.  As previously mentioned, other practice areas also participate in and profit from the Defendants' illegal scheme. On information and belief, CLRMC's Medicare In-patient net revenue in 2011 exceeded $60,000,000.00 and its Medicare Out-patient net revenue was approximately $14,000.000.00.

35.    The government is entitled to recover the taxpayer funds paid to the Defendants as a result of the above described violations of the FCA, AKS, and STARK.   The Defendants should not be allowed to profit from healthcare decisions that were influenced by profit, rather than a patient's best medical interest.    Under  applicable  legal  and  equitable  doctrines,  CLRMC  and  its

---

[5] http://www.beckershospitalreview.com.  Becker's is self-described as the "leading source of cutting-edge business and legal information for healthcare industry leaders."
[6] Becker's Hospital Review 2011: http://www.beckershospitalreview.com/lists/50-top-grossing-for-profit-hospitals-in-america.html; Becker's Hospital Review 2014:  http://www.beckershospitalreview.com/lists/50-top-grossing-for-profit-hospitals-2014.html#ftn5.

physicians should be required to disgorge all profits from its improper scheme. Millions of dollars have been received by the Defendants as a result of their false claims to the government and the exact total will be determined through the discovery process.

## COUNT 1–VIOLATIONS OF THE FALSE CLAIMS ACT 31 U.S. C. § 3729 ET SEQ

36.    Relator hereby incorporates all of the allegations set forth in paragraphs 1 through 35 above as if set forth in this count in their entirety. CLRMC knowingly submits fraudulent Hospital Cost Reports ("HCRs") to the government in order to obtain Medicare funds. It certifies to the government that the HCRs are true when in fact, they are not.

37.    At all times CLRMC has known it is illegal to submit claims to the government for services provided to any patient obtained as a result of kickbacks, improper financial relationships with physicians, and unnecessary medical procedures and tests.

38.     HCA and its affiliate CLRMC are engaging in a pattern of regular and systematic fraud on the government by virtue of:

1)    Inducing physicians to practice exclusively at CLRMC in return for the improper incentives such as illegal patient referrals, directorships and above market build outs as described above;

2)    Inducing physicians to enter into an improper financial scheme which was designed based on the volume and value of the patients seen by physicians and which exchanges patient referrals between the

physicians and CLRMC; furthermore, the improper financial scheme excludes and punishes other well-qualified physicians in the community;

3) Encouraging or allowing unnecessary procedures and treatments to be performed or repeated; claims for medically unnecessary treatments are actionable under the FCA.

Therefore, CLRMC has submitted false certifications saying it has complied with all applicable laws when it has in fact it has not.

## COUNT 2 – VIOLATIONS OF THE ANTI-KICKBACK STATUTE, 42 U.S.C. §1320a-7b(b)

39.   Relator hereby incorporates all of the allegations in paragraphs 1 through 38 above as if set forth in this count in their entirety.  The Defendants are engaged in an illegal kickback scheme involving physicians and CLRMC in violation of the AKS. The AKS prohibits the offering or paying of any remuneration (including any kickback, bribe or rebate) directly, indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

40.   The government, tax payers and innocent patients have been damaged as a direct result of the Defendants' use of the Referral List to provide illegal incentives and kickbacks under their Reward Plan.

**COUNT 3 – VIOLATIONS OF THE STARK STATUTE, 42 U.S.C. 1395nn**

41.    Relator hereby incorporates all of the allegations in paragraphs 1 through 40 above as if set forth in this count in their entirety.    Stark is a strict liability statute.  Stark prohibits submission of claims to the government that are the product of an impermissible financial arrangement. Defendants' financial arrangement with the Loyal Physicians is improper because physicians are selected for participation and given referrals based on Physician Data which is comprised of the volume and value of the patients physicians treat. Other well qualified physicians in the area are punished and excluded from Defendants' Reward Plan and Referral List.

42.    The HCA website contains the following false statement which applies to all of its affiliated hospitals and physicians:

> ***We do not pay for referrals.*** We accept patient referrals and admissions based solely on the patient's medical needs and our ability to render the needed services. We do not pay or offer to pay anyone -- colleagues, physicians, or other persons or entities -- for referral of patients.
>
> ***We do not accept payments for referrals we make.*** No HCA colleague or any other person acting on behalf of the organization is permitted to solicit or receive anything of value, directly or indirectly, in exchange for the referral of patients. ***Similarly, when making patient referrals to another healthcare provider, we do not take into account the volume or value of referrals that the provider has made (or may make) to us.***

43.     Those statements are blatantly false as has been shown in the facts related above.   The government, taxpayers and patients have been harmed as a direct result of the Defendants' Reward and Referral Plan which improperly allows profit to influence healthcare decisions. It is a system of illegal financial kickbacks and financial incentives.

<u>CONCLUSION</u>

44.     Relator Santiago Mendoza witnessed numerous, systematic violations of federal law while working for the Defendants.   The Defendants knowingly induced and accepted government funds which it obtained through the illegal and ongoing practices detailed in this Complaint. The Defendants profit from their illegal remuneration, self-referrals and financial kickbacks to physicians. Defendants' intentionally circumvent laws designed to protect patients and the taxpayers who fund their care, and therefore, should be punished to the full extent of the law.

<u>PRAYER</u>

45.     WHEREFORE, PREMISES CONSIDERED, RELATOR, on behalf of the United States government and himself, prays for judgment against the Defendants as follows:

a)    That Defendants be ordered to cease and desist from submitting and/or causing the submission of additional false claims or otherwise violating 31 U.S.C. 3729 et seq;

b)    that this Court enter judgment against the Defendants in an amount equal to three times the amount of actual damages the U.S. government has sustained because of Defendant's actions, plus all applicable civil penalties for every action in violation of 31 U.S.C. § 3729 and all applicable laws referenced herein, with interest, including Relator's costs and the costs of the U.S. government for its expenses related to this action with all amounts and penalties for specific claims to be identified after full discovery;

c)    That Relator be awarded the maximum amount permissible according to 31 U.S.C. § 3730 as well as all costs incurred, including attorneys' fees;

d)    in the event that the U.S. government continues with this action, that the Relator be awarded an amount of bringing this action of at least 15% but not more than 25% of the proceeds of the action or settlement of the claim;

e)    in the event that the U.S. government does not proceed with this action that the Relator be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages which shall not be less than 25% or more than 30% of the proceeds of the action or the settlement;

f)    All pre and post judgment interest allowed by law;

g)    That the U.S. government and Relator receive all relief both at law and in equity to which they are entitled.

## DEMAND FOR JURY TRIAL

46.    Pursuant to Fed. R. Civ. P. 38, Relator demands a trial by Jury.

---

Respectfully submitted by:

**STANLEY FRANK & ROSE, LLP**

*/s/ Michael J. Stanley*
Michael J. Stanley
State Bar No. 19046600
SDTX No. 13283
mstanley@stanleylaw.com
Brian Tagtmeier
State Bar No. 00785078
SDTX No. 16248
btagtmeier@stanleylaw.com
Leslie J. Searle
State Bar No. SBN 24039167
SDTX No. 2100074
lsearle@stanleylaw.com
7026 Old Katy Road, Suite 259
Houston, Texas  77024
Telephone:  713-980-4381
Facsimile: 713-980-1179
**ATTORNEYS FOR SANTIAGO MENDOZA, JR.
QUI TAM RELATOR**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was filed under seal on this 29th day of July 2014 on the following individuals listed below as indicated:

*/s/ Michael J. Stanley*
Michael J. Stanley

Mr. Eric H. Holder, Jr.,
Attorney General of the United States of America - Via CMRRR, Under Seal
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC  20530-0001

United States Attorney **Kenneth Magidson** - **Via Hand Delivery**, **Under Seal**
United States Attorney's Office
Southern District of Texas
1000 Louisiana, Suite 2300
Houston, TX  77002

United States Attorney Andrew Bobb - **Via Hand Delivery**, **Under Seal**
United States Attorney's Office
Southern District of Texas
1000 Louisiana, Suite 2300
Houston, TX  77002

David J. Bradley, Clerk of the Court - **Via ECF**
United States Courthouse
515 Rusk Avenue
Houston, TX 77002